YAKUB HAZZARD (SBN 150242)
yxh@msk.com
MITCHELL SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, CA  90067-3120
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

Matthew McFarlane
   (*pro hac vice* to be filed)
mmcfarlane@leichtmanlaw.com
LEICHTMAN LAW PLLC
228 East 45th Street, Suite 605
New York, NY 10017
Telephone: (212) 419-5210

Attorneys for Plaintiffs
Hanieh Sadat, GenesysOne Capital, LLC
and GenesysOne Partners, LP

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HANIEH SADAT, an individual; GENESYSONE CAPITAL, LLC, a limited liability company; and GENESYSONE PARTNERS, LP, a limited partnership,<br><br>Plaintiffs,<br><br>v.<br><br>CHEN TRADING MANAGEMENT, LLC, a limited liability company; SILVERSTONE OPPORTUNITY FUND, LLC, a limited liability company; and JIMMY CHEN, an individual,<br><br>Defendants. | CASE NO. 2:20-cv-01535<br><br>**COMPLAINT FOR:**<br>**1. SECURITIES FRAUD (15 U.S.C. § 77L);**<br>**2. SECURITIES FRAUD (15 U.S.C. § 78J(B) & 17 C.F.R. 240.10B-5);**<br>**3. SECURITIES FRAUD (CAL. CORP. CODE § 25401);**<br>**4. BREACH OF CONTRACT (Trading Services Agreement);**<br>**5. BREACH OF CONTRACT (SSO LLC Agreement);**<br>**6. BREACH OF FIDUCIARY DUTY;**<br>**7. FRAUD AND DECEIT (Intentional Misrepresentation Of Fact); And**<br>**8. NEGLIGENT MISREPRESENTATION OF FACT**<br><br>**Demand For Jury Trial** |

Plaintiffs Hanieh Sadat, GenesysOne Capital, LLC and GenesysOne Partners, LP (each individually, a "Plaintiff", and collectively, the "Plaintiffs"), by and through their undersigned attorneys, bring this Complaint and allege herein as follows:

## NATURE OF THE ACTION

1.      This is an action seeking redress for federal and state securities fraud, breach of contract, breach of fiduciary duty, and intentional and negligent misrepresentation of fact, in connection with a planned investment partnership. This action arises under the Securities Laws of the United States, Title 15 of the United States Code, and statutory and common laws of the State of California.

## THE PARTIES

2.      Plaintiff Hanieh Sadat ("Sadat") is an individual residing in Los Angeles County, California. Plaintiff Sadat's surname appears as "Sadathendi" or "Sadat Hendi" on certain documents relevant to this action.

3.      Plaintiff GenesysOne Capital, LLC ("G1 Capital") is a Delaware limited liability company registered to transact intrastate business as a foreign entity in the State of California, with a principal place of business at 750 N. San Vicente Blvd., Suite 800 West, West Hollywood, CA 90069.

4.      Plaintiff GenesysOne Partners, LP ("G1 Partners") is a Delaware limited partnership with a principal place of business at 750 N. San Vicente Blvd., Suite 800 West, West Hollywood, CA 90069.

5.      Defendant Chen Trading Management, LLC ("CTM") is a Delaware limited liability company with a principal place of business at 835 Baden Ave., South San Francisco, CA 94080.

6.      Defendant Silverstream Opportunity Fund, LLC ("SSO") is a Delaware limited liability company with a principal place of business at 835 Baden Ave., South San Francisco, CA 94080.

7.     Defendant Jimmy Chen ("Chen") is, upon information and belief, an individual residing in San Mateo County, California.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 for claims arising under Federal Law, and supplemental jurisdiction under Section 1367(a) for all other state law claims because Plaintiffs' claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Venue is proper in this Court pursuant to the agreements of the parties and 28 U.S.C. §§ 1391(b)(2), (c)(1) and (d).

## PRELIMINARY STATEMENT

9.     Plaintiffs fell victim to Defendants' scheme to induce their interest and investment in certain securities. After agreeing to work together as business partners, Plaintiffs' due diligence revealed that Defendants made persistent and significant oral and written fraudulent misrepresentations to Plaintiffs in an effort to secure investment capital for their business operations, which Plaintiffs had agreed to source in consideration of the contemplated relationship. Defendants' misconduct is further evident in the material breaches of key agreements governing the planned working relationship. Plaintiffs have been damaged and suffer economic and reputational losses as a direct result of Defendants' fraudulent, intentionally misleading, and negligent acts and omissions, and seek all remedies this Court may deem appropriate and proper in light of Defendants' behavior.

## FACTS RELEVANT TO LEGAL CLAIMS

A.     **G1 Capital and Sadat Discuss a Potential Working Relationship with Chen and CTM to Support G1 Partners' Investment in the SSO Fund.**

10.     Plaintiff Sadat has been working in the financial services sector since 2004, and has developed robust and sophisticated experience, contacts, and

Mitchell
Silberberg &
Knupp LLP

1   relationships in that space. She is a broker licensed by the Securities & Exchange

2   Commission. For the last several years, Sadat has maintained a professional focus

3   on blockchain technology-enabled digital monetary units, commonly referred to as

4   cryptocurrencies.

5          11.    In 2018, Sadat formed G1 Capital as an entity to manage new

6   investment funds she intended to create. Sadat committed significant resources to

7   establish G1 Capital and currently serves as its sole managing member.

8          12.    In April 2018, Sadat formed G1 Partners as a G1 Capital-managed

9   investment fund, with G1 Capital as the general partner. To establish G1 Partners,

10  G1 Capital paid professional services vendors approximately $120,000 in direct

11  administrative costs, and Sadat personally committed substantial non-monetary

12  resources.

13         13.    G1 Partners intended to manage investments in a wide variety of asset

14  classes, including trading in cryptocurrencies and other cryptocurrency-based

15  financial instruments, a potentially lucrative, and high risk, esoteric asset class not

16  generally accessible to the investing public. G1 Partners generated significant

17  interest from potential investors because of its capability to offer a fully-regulated,

18  fully-compliant fund that included such digital assets, as well as Sadat's deep

19  connections and specialized experience in the cryptocurrency investment space.

20         14.    Sadat first met Defendant Chen, a cryptocurrency trader, in April

21  2019.

22         15.    Chen is the sole managing member of Defendant CTM, which is the

23  sole managing member of Defendant SSO, a limited liability company holding

24  external investments and trading cryptocurrency futures (the "SSO Fund").

25         16.    The SSO Fund trades Bitcoin on several cryptocurrency exchanges

26  using strategies that exploit volatility and inefficiency in cryptocurrency markets.

27

28

17.     Chen alone directly controls the operations and activities conducted by both CTM and SSO.

18.     After their first introduction, Chen repeatedly bragged to Sadat about the impressive performance of his trading strategy. On at least two occasions, Chen told Sadat that he had generated 280% annualized returns on earlier investments utilizing SSO trading strategies on cryptocurrency exchanges.

19.     In or around June 2019, Chen, on behalf of CTM and SSO, and Sadat, on behalf of G1 Capital and G1 Partners, began discussions of forming a business relationship, whereby Chen, through CTM, would provide trading services to G1 Partners as an agent and fiduciary, and Sadat and G1 Capital would raise and provide investment capital for these trading services sourced from limited partners in G1 Partners.

20.     To accommodate the new investment strategy offered by CTM, G1 Capital incurred additional costs to draft fully compliant offering and subscription documents describing the risks attendant to investment in the strategy the partners would employ in the SSO Fund.

21.     But for the burgeoning relationship with CTM and the SSO Fund, G1 Capital and G1 Partners would not have incurred the additional costs and significant time required to modify the existing G1 Partners structure.

22.     To get access to more information about the SSO trading platform and its financial performance, G1 Capital and Chen, on SSO's behalf, entered into a Mutual Non-Disclosure Agreement.

23.     On September 4, 2019, CTM and G1 Capital executed the Trading Services Agreement, defining the terms of their business relationship.

24.     In the Trading Services Agreement, CTM represented, covenanted and warranted that it would act "in compliance with all applicable laws and regulations," and that CTM alone was responsible for its compliance. CTM

represented that "all trades, activities and transactions" "shall be fully legal and compliant with all laws, regulations and ethical guidelines in all jurisdictions where the transactions are contemplated and/or executed and shall in no manner violate any laws." In addition, the Trading Services Agreement provided as follows:

> [CTM] shall, at all times, during the Term of this Agreement, be a fiduciary of [G1 Capital] and [G1 Partners] and provide [G1 Capital] and [G1 Partners] with a high degree of trust, transparency, accuracy, full disclosure and honesty in all dealings and shall in no manner provide favoritism or bias to other persons with whom Trader is providing similar services.

Furthermore, in the Trading Services Agreement, CTM represented that all information it presented to G1 Capital would be "truthful, accurate, and complete," and agreed to notify G1 Capital within three days of learning if any information had changed or became inaccurate.

**B.    G1 Capital's Due Diligence Reveals Significant Irregularities with CTM's Administration of the SSO Fund.**

25.    Pursuant to the execution of the Trading Services Agreement, G1 Capital underwent further due diligence in order to fully vet CTM and SSO before committing any investment capital of G1 Partners' limited partners to be managed by CTM, including providing funds to be invested in the SSO Fund.

26.    To assist in Plaintiffs' consideration of working with Defendants, Chen provided Plaintiffs with a private placement memorandum intended for potential investors in SSO (the "PPM") and a slide deck containing various details about SSO's trading strategies (the "SSO Slide Deck").

27.     The SSO Slide Deck highlights its relationships with "tier 1 vendors" with deep experience in cryptocurrencies. SSO explains those relationships offer its limited partners with "compliance, security, accountability, and reduced redemption risk."

28.     As part of their business relationship, and to facilitate G1 Partners' fundraising efforts, Defendants allowed G1 Partners to incorporate information and materials from the SSO Slide Deck in G1 Partners' marketing materials to attract investor interest.

29.     To confirm the information it was sharing with potential investors, G1 Capital repeatedly requested audited financial statements from Chen to showcase his represented returns to potential investors.

30.     On at least one occasion, Chen refused to provide requested audited financial statements, claiming it was "too difficult" for SSO and CTM to make the necessary calculations.

31.     On at least one occasion, Chen admitted that he did not possess audited financial statements from any of his trading activities for the SSO Fund. On another occasion in response to a request for information about returns, Chen provided only an estimate "off the top of my head," without providing an official, more accurate response.

32.     In addition, Chen told Plaintiffs that he and CTM would regularly record and report unrealized returns on open positions, delaying reporting of profits and losses until convenient for the SSO Fund.

33.     Plaintiffs were surprised by the lack of audited financial information given SSO's representation in the PPM that it would be using Opus Fund Services ("Opus"), a respected fund administrator with responsibilities for, among other things, calculating the net asset value of the SSO Fund, managing investor relations and accounts, and performing necessary clerical and administrative

**COMPLAINT**

Mitchell
Silberberg &
Knupp LLP

11893756.1

functions. The SSO Slide Deck includes the Opus logo among its list of the vendors it "uses," describing Opus as "an award winning, independently owned-and-operated full-service global fund administrator."

34.     In the Trading Services Agreement, CTM represented and warranted that all relationships with key vendors are in good standing.

35.     In October 2019, Sadat contacted Opus directly to obtain more information, but was unable to confirm that Opus in fact managed the SSO Fund.

36.     For the entire period of their association, Defendants did not provide Plaintiffs with any evidence that Opus was administering the SSO Fund.

37.     Upon information and belief, contrary to the representations in the PPM and the SSO Slide Deck, the SSO Fund does not use Opus as a fund administrator.

38.     In the PPM, SSO represented that it "intends to be classified as a partnership for federal income tax purposes," and discloses several risks to investors relating to the SSO Fund's tax returns. However, Chen admitted to G1 Capital and Sadat that he had not filed a tax return in 2018 for SSO's trading activities, claiming he did not "want to be on the hook" for tax liability that an accountant's analysis might reveal.

39.     Sadat reasonably believed that Chen, CTM or SSO's failure to account for (and settle) its tax liabilities would improperly overstate the value of the SSO Fund's returns, and without audited financial statements, it would be impossible to determine the true value of returns to the SSO Fund's investors.

40.     Chen promised Sadat that CTM would prepare audited financials for its past trading activities with the SSO Fund by March 2020, and provide G1 Capital with those financials at that time.

41.     Starting on August 24, 2019, and throughout September and October 2019, Plaintiffs repeatedly requested SSO provide evidence supporting its

Mitchell
Silberberg &
Knupp LLP

**COMPLAINT**

11893756.1

performance claims, but neither Chen, CTM nor SSO provided the requested evidence.

42.     To receive a direct report of SSO's ongoing performance, and to better understand the accounting and reporting structure CTM used for the SSO Fund, Sadat invested $25,000 of personal funds in SSO on August 28, 2019.

43.     Sadat executed the standard Limited Liability Company Agreement that SSO provided for its investors (the "SSO LLC Agreement").

44.     Sadat's investment granted her a non-managing membership interest in the SSO Fund and allowed her access to daily and monthly SSO return amounts.

45.     Sadat reasonably believed that direct access to SSO's performance and investor returns through her own account would help substantiate Defendants' representations about their business practices.

**C.    Chen and CTM Violated the Terms of a Non-Competition, Non-Disclosure Agreement with G1 Capital**

46.     In July 2019, before entering into the Trading Services Agreement with CTM, G1 Capital engaged Marissa Kim ("Kim") as a business partner. Kim was reasonably well known in the cryptocurrency space, and Sadat relied on Kim to assist with interpretation of Defendants' trading algorithm and platform, as well as with engagement of potential investors in G1 Partners.

47.     To protect the transmission of sensitive business information, G1 Capital and Kim entered into a Mutual Business Confidentiality and Non-Circumvention Agreement (the "Kim Agreement") on July 12, 2019. The Kim Agreement included a non-circumvention provision that prohibited Kim from independently doing business with individuals and entities that G1 Capital had introduced to her as potential investors in G1 Capital (defined therein as "Exclusive Contacts").

Mitchell Silberberg & Knupp LLP

11893756.1

48.     It is common for investment funds to generate revenue from fees associated with the trading of capital provided by their investors; investor contacts are therefore a lucrative and necessary source of investment fund revenue. The purpose of the non-circumvention provision the Kim Agreement was therefore to assure that Kim could not capitalize on G1 Capital's investor networking efforts, independently solicit G1 Capital's Exclusive Contacts and their investments in a separate fund, and profit from those investment trades without paying G1 Capital a portion of those profits.

49.     Over the ensuing weeks, Kim assisted G1 Capital with investor outreach for G1 Partners, providing help with explaining to potential investors the nature of Defendants' business and the attractiveness of Defendants' apparent success. As a partner, Kim had full access to sensitive and confidential business information generated by G1 Capital.

50.     On July 14, 2019, Sadat introduced Kim to Chen and CTM as one of G1 Capital's potential investment resources. Kim and Chen communicated with each other, directly, relating to the SSO Fund's trading algorithms, and the confidential terms G1 Capital and CTM had been negotiating to form an ongoing working relationship.

51.     Before Sadat's introductions through G1 Capital, Kim had not been connected to either Chen, CTM, or SSO in any way.

52.     Chen, CTM and SSO were each aware that Kim was subject to a non-competition agreement with G1 Capital and Sadat.

53.     On August 4, 2019, Sadat discovered that Kim had recently introduced Chen to her boyfriend, Bill Barhydt ("Barhydt") in an attempt to unilaterally conduct investment activity, without Sadat's or G1 Capital's permission, in violation of the terms of the Kim Agreement.

54.     Chen later stated to an advisor to G1 Capital that he had met with Barhydt and considered him "sharp" and someone who could "easily raise $10 million."

55.     After that introduction, Chen and Barhydt continued to communicate with one another because Barhydt wanted to invest in SSO directly.

56.     Barhydt investing in SSO directly would also violate the clear terms of both the Kim Agreement, but importantly for this dispute, the Barhydt investment would violate the terms of the Trading Services Agreement.

57.     G1 Capital confronted Kim regarding her breach and terminated her relationship with G1 Capital.

58.     Sadat informed Chen that she terminated Kim as a partner of G1 Capital and that she no longer represented G1 Capital.

59.     Sadat informed Chen that he could not accept either Kim or Barhydt as investors because that would violate the terms of the Trading Services Agreement, and defeat the purpose of their working relationship if Chen could avoid paying G1 Capital its share of any performance fees for G1 Capital's Exclusive Contacts.

60.     To further discuss the situation, Sadat asked Chen to meet on September 19, 2019 in San Francisco with a G1 Capital advisor, Bill Mundell.

61.     At the September 19, 2019 meeting, Sadat and Mundell requested that Chen execute a Non-Competition Non-Disclosure Agreement on September 19, 2019 (the "NCNDA") to make it clear that non-circumvention was a priority for G1 Capital.

62.     When he signed the NCNDA, Chen acknowledged to Sadat and Mundell that he understood that by signing the agreement, he could not accept funds from Barhydt because he was an Exclusive Contact ineligible for his direct engagement.

63.     In the NCNDA, the parties consented to the jurisdiction of and acknowledged proper venue in the Central District of California for any actions arising out of or related to the NCNDA.

64.     CTM is also prohibited from accepting funds from Barhydt. Under the Trading Services Agreement, CTM agreed that for a period of two years after introduction, it would not circumvent the other party to engage in business with the other party's persons, their employees, officers, directors, agents, representatives, assigns, subsidiaries or direct referrals introduced by the other party (the "Representative", or "Representatives"), unless permission was received or a preexisting relationship was already established prior to the introduction. Chen and CTM were introduced to Barhydt through Marissa Kim while she was engaged with G1 Capital, and therefore, Barhydt is a "direct referral" of G1 Capital and off-limits to CTM under the clear terms of the Trading Services Agreement.

**D.     Evidence of Chen and CTM's Persistent Misconduct Becomes Clear**

65.     By failing to account or pay for any tax liability incurred in 2018 as a result of SSO's investments, or by failing to file a tax return with the Internal Revenue Service in 2018, Chen and CTM were not in compliance with all applicable United States laws and regulations.

66.     The SSO Slide Deck represented that the SSO Fund trades across seven exchanges: Coinbase Prime, Binance, OKEx, BitMEX, Kraken, Huobi Pro and Bitfinex.

67.     Chen told Sadat in the presence of an advisor that Chen or CTM has actively traded on BitMEX.

68.     Upon information and belief, under its terms of service, BitMEX prohibits access or use of their services (including the BitMEX trading platform) for those located, incorporated or otherwise established in, or a citizen or resident of, any "Restricted Jurisdiction."

69.     Upon information and belief, BitMEX considers the United States as a Restricted Jurisdiction.

70.     All Defendants are either located, incorporated or otherwise established in, or a citizen or resident of, the United States.

71.     Chen told Sadat that CTM accesses BitMEX for the SSO Fund trading platform through an alias he created using a United Kingdom resident's name, and a virtual private network ("VPN") to circumvent any automatic exclusion mechanisms BitMEX and many other companies to restrict access to users connecting to the internet through an internet protocol ("IP") address located in a Restricted Jurisdiction, such as the United States.

72.     Chen and CTM intentionally and knowingly violated BitMEX's Terms of Service.

73.     By trading on the BitMEX exchange, falsely assuming the identity of another person in a permitted jurisdiction, and using a VPN to mask their true physical location, Chen and CTM not only breached the representations, warranties and other obligations CTM agreed to in the Trading Services Agreement, but also provides direct evidence of their intent to mislead others and defraud investors and potential investors in the SSO Fund.

74.     Upon information and belief, Bitfinex, another Bitcoin exchange that CTM uses in connection with the SSO Fund, likewise restricts access to persons and entities in the United States.

75.     In the meantime, Chen continued to misrepresent the basic financials of the SSO Fund. In late August 2019, Chen told Sadat that he had approximately $9,000,000 in assets under management, and in October 2019, Chen told Sadat that he had approximately $16,000,000 in assets under management.

Mitchell Silberberg & Knupp LLP

11893756.1

76.     Sadat asked Chen whether the increase in assets under management was due to new capital, Chen said it was not, and the increase was due to trading activity only.

77.     Based on Chen's representations, Sadat reasonably believed that SSO Fund had returned >50% during that period.

78.     However, Sadat did not see a corresponding increase in the value of her personal account with the SSO Fund. Instead, Sadat's account increased only 9% according to a "dashboard" Chen provided to report her account.

79.     Sadat discussed this discrepancy with Chen, who then admitted that the increase was due to new capital.

80.     Sadat later received word that Chen had accepted $5,000,000 from Barhydt in violation of agreements that CTM had made in the Trading Services Agreement and the NCNDA.

81.     When Sadat confronted Chen regarding his solicitation and retention of Barhydt's funds for investment in the SSO Fund, Chen did not deny the allegation. Rather, Chen admitted that Bayhardt had contributed $400,000, not the $5,000,000 that Sadat claimed.

82.     Chen's activity, on behalf of CTM and SSO, has caused Plaintiffs substantial reputational and monetary harm. Not only were Chen's return claims fraudulently misrepresentative and made to form a business relationship with Plaintiffs, Defendants' conduct has caused Plaintiffs loss of future business opportunities, significant monetary waste, and lost efforts in their earnest attempts to build a successful fund that is fully compliant with all applicable laws and regulations.

1

**FIRST CAUSE OF ACTION**

2

**Securities Fraud (15 U.S.C. § 77l)**

3

**By All Plaintiffs Against All Defendants**

4   83.   Plaintiffs incorporate the preceding paragraphs as though fully set

5   forth herein.

6   84.   The Trading Services Agreement, which governs how CTM will

7   conduct its trading activities within the SSO Fund, and the SSO LLC Agreement,

8   which defines investment terms for investors in the SSO Fund, are contracts that are

9   provided by Defendants in an effort to induce investment capital in the SSO Fund.

10   85.   Because these contracts were: (1) provided by Defendants to Plaintiffs

11   as a direct result of either (a) the provision of investment capital, or (b) the stated

12   desire to provide investment capital; (2) taken together, contracts governing

13   investments in the SSO Fund as a common enterprise, and; (3) explicit in their

14   shared purpose of generating profits for Plaintiffs as a result of Defendants' trading

15   activities, these contracts are properly considered investment contracts and are

16   therefore securities under United States federal securities law.

17   86.   The PPM and SSO Slide Deck were key communications used by

18   Defendants to disclose material financial information about the SSO Fund to

19   potential investors, such as Plaintiffs, and induce Plaintiffs' interest in potentially

20   investing in such.

21   87.   The PPM and the SSO Slide Deck qualify as prospectuses, or oral

22   communications that relate to prospectuses, under 15 U.S.C. § 77l(a)(2) and as

23   defined in *Gustafson v. Alloyd Co.*, 513 U.S. 561, 584 (1995), because they

24   contained material information relating to the finances and performance activity of

25   the SSO Fund. The PPM and SSO Slide Deck qualify as public offerings (*SEC v.*

26   *Murphy*, 626 F.2d 633, 644-47 (9th Cir. 1980)).

27

28

Mitchell
Silberberg &
Knupp LLP

11893756.1

15

**COMPLAINT**

88.     Because Defendants' activity qualifies as public offerings, Defendants' activity is subject to civil liability under 15 U.S.C. § 77l.

89.     Using electronic mail, text messages and oral communications to Sadat, Defendants made untrue statements of material fact or omitted to state material facts necessary in order to make their statements not misleading.

90.     The untrue statements of material fact, and the omissions of material facts, were not known by Plaintiffs prior to dealing with Defendants, and by the exercise of due diligence could not have been known by Plaintiffs prior to Sadat's investment in the SSO Fund in September 2019.

91.     Plaintiffs have suffered actual damages as a result of the acts complaint of herein in an amount unknown at present and to be determined at trial.

92.     Defendants have gained profits that are attributable to the acts complained of herein in an amount unknown at present and to be determined at trial.

93.     By engaging in the conduct described above, Defendants violated Section (a)(2) of 15 U.S.C. § 77l, and Plaintiffs are hereby entitled to actual damages and any additional punitive damage not taken into account in computing their actual damages.

**SECOND CAUSE OF ACTION**

**Securities Fraud (15 U.S.C. § 78j(b) and 17 CFR § 240.10(b)-5))**

**By All Plaintiffs Against All Defendants**

94.     Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

95.     Defendants made a materially false statement that the returns generated from their trading activities approximated 280%, with the knowledge that such a statement would induce Plaintiffs to form a business relationship with CTM and invest funds in the SSO Fund.

Mitchell
Silberberg &
Knupp LLP

11893756.1

16
**COMPLAINT**

96.     Defendants knew this statement was materially false when it was made because they confirmed that they do not keep audited financial records of their trading activity, and thus have no way of proving this fact as true.

97.     Defendants also made a materially false statement in the Trading Services Agreement that they would conduct their trading activities in compliance with all U.S. laws and regulations.

98.     Defendants knew this statement was materially false when it was made.

99.     Defendants made those materially false statements intentionally in an effort to induce Plaintiffs into entering into a business relationship; Defendants knew or should have known that Plaintiffs would not have entered into business with Defendants if they knew the truth about Defendants' trading practices.

100.    Plaintiffs reasonably relied on Defendants' representations, warranties, and covenants when determining whether to engage in a business relationship with Defendants, and had no reason at the time to disbelieve the validity of the statements.

101.    Defendants knew that Plaintiffs were relying on the truthfulness of Defendants' statements.

102.    Defendants had actual knowledge of the misrepresentations set forth herein, or acted with reckless disregard for the truth in failing to ascertain and to disclose such facts. Defendants' material misrepresentations and/or omissions were made knowingly or recklessly for the purpose and effect of concealing Defendants' fraudulent business activity.

103.    Plaintiffs have suffered actual damages as a result of the acts complained of herein in an amount unknown at present and to be determined at trial.

104.   Defendants have gained profits that are attributable to the acts complained of herein in an amount unknown at present and to be determined at trial.

105.   By engaging in the conduct described above, Defendants violated Section 10b-5 of the Exchange Act and Rule 10(b)-5 thereunder (15 U.S.C. § 10(b) and 17 C.F.R.  240.10b-5), and Plaintiffs are hereby entitled to actual damages and any additional punitive damage not taken into account in computing their actual damages.

**THIRD CAUSE OF ACTION**

**Securities Fraud (Cal. Corp. Code § 25401)**

**By All Plaintiffs Against All Defendants**

106.   Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

107.   The Trading Services Agreement, which governs how CTM will conduct its trading activities within the SSO Fund, and the SSO LLC Agreement, which defines investment terms for investors in the SSO Fund, are contracts that are provided by Defendants in an effort to induce investment capital in the SSO Fund.

108.   Because these contracts were: (1) provided by Defendants to Plaintiffs as a direct result of either (a) the provision of investment capital, or (b) the stated desire to provide investment capital; (2) taken together, contracts governing investments in the SSO Fund as a common enterprise, and; (3) explicit in their shared purpose of generating profits for Plaintiffs as a result of Defendants' trading activities, these contracts are properly considered investment contracts and are therefore securities under California state securities law.

109.   The PPM and SSO Slide Deck were key communications used by Defendants to disclose material financial information about the SSO Fund to

18

**COMPLAINT**

1  potential investors, such as Plaintiffs, and induce Plaintiffs' interest in potentially

2  investing in such.

3       110.   Defendants, in connection with the offer or sale of investment contract

4  securities to Plaintiffs, made written and oral communications through the PPM,

5  the SSO Slide Deck, and other communication mediums, that contained untrue

6  statements of material fact or omitted to state material facts necessary in order to

7  make their statements not misleading.

8       111.   The untrue statements of material fact, and the omissions of material

9  facts, were not known by Plaintiffs prior to dealing with Defendants, and by the

10 exercise of due diligence could not have been known by Plaintiffs prior to Sadat's

11 investment in the SSO Fund on September 2019.

12      112.   Plaintiffs have suffered actual damages as a result of the acts

13 complaint of herein in an amount unknown at present and to be determined at trial.

14      113.   Defendants have gained profits that are attributable to the acts

15 complained of herein in an amount unknown at present and to be determined at

16 trial.

17      114.   By engaging in the conduct described above, Defendants violated

18 Section 25401 of the California Corporate Securities Law of 1968, and Plaintiffs

19 are hereby entitled to actual damages and any additional punitive damage not taken

20 into account in computing their actual damages.

21

22

23                          **FOURTH CAUSE OF ACTION**

24              **Breach of Contract (Trading Services Agreement)**

25              **By All Plaintiffs Against Defendants Chen and CTM**

26      115.   Plaintiffs incorporate the preceding paragraphs as though fully set

27 forth herein.

28

Mitchell
Silberberg &
Knupp LLP

19

**COMPLAINT**

11893756.1

116.   By signature of their respective managing members, G1 Capital and CTM entered into the Trading Services Agreement on September 4, 2019.

117.   The Trading Services Agreement is a valid and enforceable contract.

118.   G1 Capital performed all terms, conditions, and covenants required to be performed on its part under the Trading Services Agreement, except as such performance was excused, rendered impossible, impracticable, and/or futile, by acts and omission of Defendants.  G1 Capital did not waive, release, or discharge any part of Defendants' performance under the Trading Services Agreement.

119.   A material term of the Trading Services Agreement is CTM's promise to provide G1 Capital and G1 Partners with a high degree of trust, transparency, accuracy, full disclosure and honesty in all dealings.

120.   A material term of the Trading Services Agreement is CTM's representation, covenant and warranty that it would act "in compliance with all applicable laws and regulations."

121.   A material term of the Trading Services Agreement is CTM's representation that all relationships with vendors and service providers are in good standing.

122.   A material term of the Trading Services Agreement is CTM's representation that all information CTM provides is "truthful, accurate and complete."

123.   Defendants Chen and CTM breached the Trading Services Agreement by impersonating a resident of the United Kingdom and using a VPN to access the BitMEX trading platform.

124.   Defendants Chen and CTM breached the Trading Services Agreement by failing to file a Federal tax return for the SSO Fund in 2018.

125.   Defendants Chen and CTM breached the Trading Services Agreement by consistently failing to provide critical financial information about the SSO Fund

**COMPLAINT**

Mitchell
Silberberg &
Knupp LLP

11893756.1

upon request, and by failing to provide audited financials to investors in the SSO Fund.

126.   Defendants Chen and CTM breached the Trading Services Agreement by failing to provide audited financial information and investor account information through its service provider Opus, and failed to provide accurate information regarding investment returns and investor account balances.

127.   As a result of Defendants' breach Plaintiffs have suffered actual economic losses, substantial damage to new and existing business relationships, incurred substantial administrative expenses and personal expenses, did not receive the contractually anticipated investor capital, and suffered substantial and ongoing reputational harm.

128.   Plaintiffs are entitled to actual damages to remedy the harm caused by Defendants' breach of the Trading Services Agreement.

## FIFTH CAUSE OF ACTION

### Breach of Contract (SSO LLC Agreement)

### By Plaintiff Sadat Against All Defendants

129.   Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

130.   By signature of Sadat and CTM as the sole managing member of SSO, Sadat and SSO entered into the SSO LLC Agreement.

131.   The SSO LLC Agreement is a valid and enforceable contract.

132.   Sadat performed all terms, conditions, and covenants required to be performed on her part under the SSO LLC Agreement, except as such performance was excused, rendered impossible, impracticable, and/or futile, by acts and omissions of Defendants.  Sadat did not waive, release, or discharge any part of Defendants' performance under the SSO LLC Agreement.

133.   A material term of the SSO LLC Agreement is SSO's representation—effectuated by CTM as its sole managing member, and therefore Chen as the sole managing member of CTM—that it will consistently maintain records relating to the business and affairs of SSO.

134.   A material term of the SSO LLC Agreement is SSO's representation—effectuated by CTM as its sole managing member, and therefore Chen as the sole managing member of CTM— that non-managing member investors, such as Sadat, are entitled to request, receive, and inspect such business records, to be provided by CTM as the sole managing member of SSO.

135.   A material term of the SSO LLC Agreement is SSO's representation—effectuated by CTM as its sole managing member, and therefore Chen as the sole managing member of CTM—is that CTM will provide quarterly reports of the SSO Fund's performance to non-managing member investors, such as Sadat.

136.   Defendants repeatedly refused requests from Sadat for record inspection, for which she was so entitled under the SSO LLC Agreement.

137.   Defendants repeatedly failed to provide quarterly reports of the SSO Fund's performance.

138.   Defendants breached the terms of the SSO LLC Agreement by consistently failing to provide critical financial information about the SSO Fund, both upon Sadat's request and despite the requirement of to do so quarterly.

139.   As a result of Defendants' breach, Plaintiffs have suffered actual economic losses, substantial damage to new and existing business relationships, incurred substantial administrative expenses and personal expenses, did not receive the contractually anticipated investor capital, and suffered substantial and ongoing reputational harm.

140.   Plaintiffs are entitled to actual damages to remedy the harm caused by Defendants' breach of the SSO LLC Agreement.

**SIXTH CAUSE OF ACTION**

**Breach of Fiduciary Duty**

**Cal. Civ. Prac. Torts § 22:18**

**By All Plaintiffs Against Defendants Chen and CTM**

141.   Plaintiffs incorporate the preceding paragraphs as though fully set forth therein.

142.   Under the Trading Services Agreement, CTM agreed to an express fiduciary relationship with Plaintiffs.

143.   Chen, as the sole managing member of CTM, knew of CTM's contractual obligations to Plaintiffs as a fiduciary.

144.   CTM breached its fiduciary duty to Plaintiffs by failing to take reasonable steps to safeguard Plaintiffs' assets and misrepresenting the financial performance of the SSO Fund.

145.   Plaintiffs were damaged as a result of CTM's breach of fiduciary duty and Plaintiffs are hereby entitled to a recovery of both compensatory and punitive damages.

**SEVENTH CAUSE OF ACTION**

**Fraud and Deceit (Intentional Misrepresentation of Fact)**

**California Civil Code § 1709**

**By All Plaintiffs Against All Defendants**

146.   Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

147.   Defendants represented to Plaintiffs that their trading activities were compliant with all applicable U.S. laws and regulations, that they would pay tax expenses generated from their activity, and that they would not circumvent

**COMPLAINT**

Mitchell
Silberberg &
Knupp LLP

11893756.1

Plaintiffs and engage in business opportunities with Plaintiffs' preexisting Exclusive Contacts.

148.    All of Defendants' representations were in fact false.

149.    Defendants knew that those representations were false at the time Defendants made them.

150.    Defendants intended that Plaintiffs rely on their fraudulent misrepresentations of fact to induce Plaintiffs into a business relationship, and knew that if Plaintiffs were aware of the truth of Defendants' business practices, they would have never entered into any business relationship with them.

151.    Plaintiffs did in fact rely on Defendants fraudulent misrepresentations.

152.    As a direct and proximate result of Defendants' fraudulent misrepresentations, Plaintiffs have suffered substantial monetary harm, reputational damage, and loss to future business opportunities, and as a result, Plaintiffs are entitled to recover an amount unknown and to be determined at trial.

## EIGHTH CAUSE OF ACTION

### Negligent Misrepresentation of Fact

### Cal. Civ. Prac. Torts § 22:14

### By All Plaintiffs Against All Defendants

153.    Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

154.    Defendants misrepresented several facts to Plaintiffs over the course of their business dealings.

155.    Defendants have not provided, despite numerous attempts by Plaintiffs at retrieving information pertaining to such, any document or proof that the alleged misrepresentations are in fact true.

156.    Defendants had no reasonable ground for believing their numerous misrepresentations to be true.

157.   Defendants made these representations to Plaintiffs with the intention of inducing Plaintiffs to rely on this representation and persuade Plaintiffs to enter into a business relationship.

158.   Plaintiffs reasonably relied on these representations in beginning business formation discussions with Defendants, entering into business with Defendants, beginning the process of investor outreach and fundraising, and personally investing $25,000 USD in the SSO Fund.

159.   Upon discovery that Defendants' representations were false, Plaintiffs took several steps to mitigate harm.

160.   As a result of Defendants' misrepresentations, Plaintiffs incurred substantial administrative expenses, reputational harm, and loss to future business opportunities, and are entitled to recover damages in an amount unknown and to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray for entry of judgment in their favor and against Defendants as follows:

(a)      Entering a judgment for a preliminary and permanent injunction enjoining Defendants, their respective members, officers, principals, shareholders, agents, servants, employees, attorneys, successors, and assigns; their divisions, such divisions' respective members, officers, principals, shareholders, agents, servants, employees, attorneys, successors, and assigns; and those in privity with or in active concert or participation with any of them who receive actual notice of the judgment by personal service or otherwise from any further violations of 15 U.S.C. § 77l, Sections 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10(b)-5 thereunder, 17 C.F.R. § 240.10(b)-5, as well as any further misappropriation of Plaintiffs' confidential information or Exclusive Contacts;

1    (b)    Ordering Defendants' restitution of all actual amounts paid by

2  Plaintiffs in furtherance of obligations incurred through its contracts with

3  Defendants;

4    (c)    Awarding compensatory damages, statutory damages, punitive

5  damages, exemplary damages, and such other relief as provided by the statutes

6  cited herein and by operation of law;

7    (d)    Awarding the costs of bringing suit and other reasonable costs,

8  including reasonable attorneys' fees;

9    (e)    Ordering Defendants to disgorge the illegal trading profits described

10  herein;

11    (f)    Awarding pre-judgment and post-judgment interest on any such

12  monetary relief declared, and

13    (g)    Awarding Plaintiffs such other and further relief as this Court deems

14  just and proper.

15

16  DATED FEBRUARY 14, 2020:        MITCHELL SILBERBERG & KNUPP LLP
                                    YAKUB HAZZARD

17

18                                  By:  /s/ Yakub Hazzard
                                         Yakub Hazzard
19                                       2049 Century Park East, 18th Floor
                                         Los Angeles, CA  90067-3120
20                                       Telephone: (310) 312-2000

21                                       Matthew McFarlane
                                           (*pro hac vice* to be filed)
22                                       mmcfarlane@leichtmanlaw.com
                                         LEICHTMAN LAW PLLC
23                                       228 East 45th Street, Suite 605
                                         New York, NY 10017
24                                       Telephone: (212) 419-5210

25                                       Attorneys for Plaintiffs Hanieh Sadat,
                                         GenesysOne Capital, LLC, and
26                                       GenesysOne Partners, LP

27

28

**COMPLAINT**

Mitchell
Silberberg &
Knupp LLP

11893756.1

1

## **DEMAND FOR JURY TRIAL**

2          Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs

3   demand a trial by jury of any and all issues on which a trial by jury is available

4   under applicable law.

5

6   DATED FEBRUARY 14, 2020:       MITCHELL SILBERBERG & KNUPP LLP
7                                  YAKUB HAZZARD

8

9                                  By:  /s/ Yakub Hazzard
                                        Yakub Hazzard
10                                      2049 Century Park East, 18th Floor
                                        Los Angeles, CA  90067-3120
11                                      Telephone: (310) 312-2000

12                                      Matthew McFarlane
                                          (*pro hac vice* to be filed)
13                                      mmcfarlane@leichtmanlaw.com
                                        LEICHTMAN LAW PLLC
14                                      228 East 45th Street, Suite 605
                                        New York, NY 10017
15                                      Telephone: (212) 419-5210

16                                      Attorneys for Plaintiffs Hanieh Sadat,
                                        GenesysOne Capital, LLC, and
17                                      GenesysOne Partners, LP

18

19

20

21

22

23

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

27
**COMPLAINT**

11893756.1