MARK T. YOUNG (Bar No. 88951)
TAYLOR F. WILLIAMS (Bar No. 281331)
LUCAS E. ROWE (Bar No. 298697)
DONAHOE YOUNG & WILLIAMS LLP
25152 Springfield Court, Suite 345
Valencia, California 91355
Telephone:  661.259.9000 / Facsimile:  661.554.7088
E-mail: myoung@dywlaw.com; twilliams@dywlaw.com;
         lrowe@dywlaw.com

Attorneys for Defendants
CHEN TRADING MANAGEMENT,
LLC, SILVERSTREAM OPPORTUNITY
FUND, LLC, and JIMMY CHEN

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| HANIEH SADAT, an individual; GENESYSONE CAPITAL, LLC, a limited liability company; and GENESYSONE PARTNERS, LP, a limited partnership,<br><br>             Plaintiffs,<br><br>     v.<br><br>CHEN TRADING MANAGEMENT, LLC, a limited liability company; SILVERSTREAM OPPORTUNITY FUND, LLC, a limited liability company; and JIMMY CHEN, an individual,<br><br>             Defendants. | CASE NO. 2:20-cv-01535-JFW-MRW<br><br>**JIMMY CHEN, CHEN TRADING MANAGEMENT, LLC AND SILVERSTREAM OPPORTUNITY FUND, LLC'S FIRST AMENDED COUNTERCLAIMS AGAINST HANIEH SADAT, GENESYSONE CAPITAL, LLC, AND GENESYSONE PARTNERS, LP**<br><br>**[PURSUANT TO FRCP 15(a)(1)(A)]**<br><br>*[Assigned to Hon. John F. Walter]* |

Pursuant to Rule 15(a)(1)(A) of the Federal Rules of Civil Procedure, Defendants CHEN TRADING MANAGEMENT, LLC, and SILVERSTREAM OPPORTUNITY FUND, LLC (collectively, "Defendants"), hereby answer the First

1

Amended Complaint ("FAC") (Dkt. No. 19) filed on May 4, 2020 by Plaintiffs HANIEH SADAT, GENESYSONE CAPITAL, LLC, and GENESYSONE PARTNERS, LP (collectively, "Plaintiffs"), as follows:

## COUNTERCLAIMS

Counterclaimants Jimmy Chen ("Chen"), Silverstream Opportunity Fund, LLC ("SSO"), and Chen Trading Management, LLC ("CTM") brings the following counterclaims against Hanieh Sadat ("Sadat"), GenesysOne Partners, LLP ("G1 Partners"), and GenesysOne Capital, LLC ("G1 Capital"), as follows:

### The Parties

1. Counterclaimant SSO is a limited liability company organized under the laws of the State of Delaware with its principal place of business in San Francisco, California.

2. Counterclaimant CTM is a limited liability company organized under the laws of the State of Delaware with its principal place of business in San Francisco, California.

3. Counterclaimant Chen an individual residing in San Mateo County, California. (Chen, CTM, and SSO are collectively referred to as the "Counterclaimants").

4. Counter-defendant Sadat is an individual residing in Los Angeles County, California.

5. Counter-defendant G1 Capital is a Delaware limited liability company registered to transact intrastate business as a foreign entity in the State of California, with a principal place of business in West Hollywood, California.

6. Counter-defendant G1 Partners is a Delaware limited partnership with a principal place of business in West Hollywood, California. (Counter-defendants Sadat, G1 Partners, and G1 Capital are collectively referred to as "Counter-Defendants").

7. Upon information and belief, Sadat is the sole managing member of G1

2

DEFENDANTS JIMMY CHEN, CHEN TRADING MANAGEMENT, LLC AND SILVERSTREAM
OPPORTUNITY FUND, LLC'S FIRST AMENDED COUNTERCLAIMS

Capital and the managing partner of G1 Partners.

## Jurisdiction and Venue

8. Counter-Defendants'/Plaintiffs' First Amended Complaint includes federal securities claims, which are subject to this Court's jurisdiction pursuant to 28 U.S.C. § 1331 for claims arising under Federal Law. This Court has supplemental jurisdiction over state law claims pursuant to Section 1367(a) because Counterclaimants' claims arise out of the same transaction, incident, or event on which Counter-Defendants'/Plaintiffs' First Amended Complaint is based. As a result, Counterclaimants' claims constitute compulsory claims, pursuant to Rule 13(a) of the Federal Rules of Civil Procedure.

9. Venue is proper in this Court pursuant to the agreements of the parties and 28 U.S.C. §§ 1391(b)(2), (c)(1) and (d).

## Facts

10. While still in high school, Chen created a software company, which he sold at 18 years old. Chen later turned to investing in securities, which he has been engaged in on a personal level for more than a decade. Over the last several years, Chen has focused his efforts on cryptocurrency trading. In support of that focus, Chen developed a propriety trading algorithm designed to exploit volatility & inefficiencies of cryptocurrency markets, which are trading platforms used to trade in cryptocurrencies such as Bitcoin. The algorithm seeks to predict momentum-based volatility in trending markets. It aims to discover opportunistic, high reward-to-risk scenarios in Bitcoin prices where volatility may exist (the "Algorithm").

11. The Algorithm was, at all times relevant, a trade secret owned and controlled by Chen, and which would serve as the basis for trading methodology within SSO or any other fund where CTM was acting as the trading services provider. The Algorithm exists in a state of computer code, which Chen has taken steps to protect by encrypting the Algorithm's computer code and entering into written non-disclosure agreements with any party with which Chen may desire to do business.

Chen entered into such a non-disclosure agreement with Counter-Defendants G1 Partners and G1 Capital, which are both owned or controlled by Counter-Defendant Sadat.

12. The Algorithm is not a methodology readily known by the public or in the cryptocurrency trading industry.

13. In November 2018, Chen formed SSO and CTM as Delaware limited liability companies. SSO was designed as an investment fund t, while CTM was organized as a provider of trading services. CTM is also the sole managing member of SSO.

Agreements Between the Parties

14. In April 2019, Chen was introduced to Sadat through a mutual acquaintance. Chen and Sadat agreed to an exchange of information so that they could determine whether a mutually beneficial business relationship could be formed. In order to facilitate the exchange of information, the parties entered into several written agreements, including a Mutual Non-Disclosure Agreement ("MNDA"), a Non-Circumvention Non-Disclosure Agreement ("NCNDA"), and a Trading Services Agreement ("TSA"). Each of the agreements are governed by California law, pursuant to the terms of the respective agreements.

15. The parties to the MNDA are G1 Capital and SSO.

16. The parties to the NCNDA are G1 Capital, G1 Partners, and GenesysOne Offshore Cryptoreserves, Ltd. ("G1OC") on the one hand and SSO and Chen on the other hand.

17. Upon information and belief, Sadat is the managing partner of G1OC.

18. The parties to the TSA are G1 Capital, G1 Partners, and G1OC on the one hand and CTM on the other hand.

19. By its terms, the MNDA provides that the parties "have an interest in participating in discussions related to potential business relationship [] wherein either Party might share information with the other that the disclosing Party considered to

4

DEFENDANTS JIMMY CHEN, CHEN TRADING MANAGEMENT, LLC AND SILVERSTREAM OPPORTUNITY FUND, LLC'S FIRST AMENDED COUNTERCLAIMS

be proprietary and confidential to itself[.]"

20. The NCNDA, by its terms, prohibited any of the parties from disclosing the proprietary information of the other to third-parties without authorization from the owner of the proprietary information. Specifically, the NCNDA states:

> "The Receiving Party shall maintain the Disclosing Party's Proprietary Information in strict confidence and may not disclose such Proprietary Information to any person, except as provided herein. Each Party recognizes and acknowledges the competitive value and confidential nature of the Proprietary Information and the damage that could result to the Disclosing Party if information contained therein were disclosed to any third party. Each Party agrees that the Proprietary Information provided by the Disclosing Party will not be used for any other purposes of any nature, including, without limitation, in any manner directly or indirectly competitive with or otherwise actually or potentially detrimental to the Disclosing Party. The Receiving Party shall promptly notify the Disclosing Party of any unauthorized use, knowledge, disclosure or loss of the Disclosing Party's Proprietary Information. The obligations of this section shall last three (3) years after the Effective Date; for any trade secret, for such longer period that a trade secret remains secret; and in perpetuity for all non-public personally identifiable information of a natural person."

21. The TSA is nothing more than an agreement between the parties to utilize CTM as G1 Capital's fund trader and manager. The TSA requires CTM to act in a fiduciary capacity with respect to the funds traded.

22. Among the information disclosed to Sadat, directly and through her respective entities, was the SSO Slide Deck and information related to the Algorithm.

23. Sadat, without Counterclaimants' authorization, misappropriated the

5

DEFENDANTS JIMMY CHEN, CHEN TRADING MANAGEMENT, LLC AND SILVERSTREAM
OPPORTUNITY FUND, LLC'S FIRST AMENDED COUNTERCLAIMS

information and material from the SSO Slide Deck by "creating" a slide deck for G1 Partners, replacing SSO's logo with G1 Partners' logo and making some formatting and design changes. Sadat then passed the information in G1 Partners' Slide Deck off as its own.

24. Upon information and belief, Sadat used the G1 Partners' Slide Deck to solicit potential investors to invest in her own fund, G1 Capital.

25. In or around September 2019, Sadat became aware that a potential G1 Partners investor, Bill Barhydt ("Barhydt"), had invested directly in SSO. Barhydt was introduced to Chen by Marissa Kim, a mutual acquaintance of Sadat and Chen. Sadat told Chen that she and Kim were "business partners" and that communicating with Barhydt constituted a breach of the NCNDA. At the time Sadat made this representation, she knew it to be false, as Sadat and Kim were not business partners, but were merely acquaintances.

26. Barhydt had invested approximately $462,000 directly in SSO, signing the SSO Subscription Agreement.

27. Sadat demanded that SSO, through Chen, cease all business with Barhydt or pay her various "management fees," pursuant to the TSA. Sadat further claimed that Barhydt's investment in SSO was a breach of the NCNDA's non-circumvention provision.

28. Upon information and belief, Sadat knew the non-circumvention provision of the NCNDA was unenforceable in the state of California, pursuant to California Business and Professions Code §16600, et seq., because the provision constitutes an unlawful restraint on trade.

29. SSO, through counsel, advised Sadat that the NCNDA provision upon which Sadat relied is unenforceable pursuant to California Business and Professions Code §16600, which states that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or <u>business of any kind</u> is to that extent void." (Emphasis added).

30. Sadat further threatened all Counterclaimants that she would file a lawsuit against them if SSO did not comply with her demands. Sadat made these demands despite the fact that SSO was not a party to the TSA nor did the TSA create an exclusive relationship between CTM and G1 Partners, G1 Capital, and G1OC. In fact, the TSA affirmatively states that the TSA "is non-exclusive and Trader (CTM) may provide trading services for other persons…[.]"

31. Despite Sadat's demands that SSO cease its relationship with Barhydt and her apparent apprehensions about the quality of information provided by Chen, Sadat decided to personally invest $25,000 in SSO. Sadat signed the SSO Subscription Agreement, which states, among other things, that as an investor in SSO and, therefore, a signor of the SSO Subscription Agreement, Sadat knew that the funds in SSO could be used to cover expenses related legal actions brought by or against SSO.

32. As one of only two investors in SSO and having the largest financial stake in SSO, Barhydt (and his investment) stood to pay essentially all the legal expenses related to litigation against SSO. Sadat, relying on an unenforceable contract provision and the lack of privity between certain parties, sought to interfere and disrupt the existing relationship between SSO and Barhydt.

33. Upon Sadat, G1 Capital, and G1 Partners filing the instant lawsuit, SSO provided notice to Barhydt of such lawsuit. Consequently, Barhydt withdrew his investment in its entirety.

## FIRST CAUSE OF ACTION

### (Misappropriation of Trade Secrets)

### (18 U.S.C. § 1836, et. seq.)

### By Counterclaimant Chen Against All Counter-Defendants

34. Counterclaimants incorporate each and every preceding allegation of the Counterclaims as if fully re-written herein.

35. The Algorithm was developed solely and exclusively by Chen with the

7

DEFENDANTS JIMMY CHEN, CHEN TRADING MANAGEMENT, LLC AND SILVERSTREAM OPPORTUNITY FUND, LLC'S FIRST AMENDED COUNTERCLAIMS

goal being that CTM would use the Algorithm to trade cryptocurrencies using the monies of whatever investment fund for which CTM was operating as the trading service provider.

36. At the time of misappropriation, Counter-Defendants knew that the Algorithm and its functionality were and are trade secrets of Counterclaimant Chen.

37. Counter-Defendants have improperly retained or used the Algorithm (i.e., trade secrets), or disclosed it to third-parties without Chen's consent or authorization.

38. The Algorithm has independent economic value because it could be used by any competent cryptocurrency trader to exploit the vulnerabilities in the cryptocurrency trading markets, thereby diminishing the value of the Algorithm to Chen and any entity to which he licenses or permits the Algorithm's use.

39. Sadat, pursuant to the NCNDA and MNDA, had an affirmative duty to maintain the secrecy or limit the use of the Algorithm.

40. Chen has been harmed, in an amount to be determined at trial, as a result of Counter-Defendants' misappropriation because Counter-Defendants may now use or reverse engineer the Algorithm, thereby reducing the value of the Algorithm to Chen.

41. Counter-Defendants' retention, use, or disclosure of the Algorithm was/is a substantial factor in causing harm to Chen.

42. Chen is hereby entitled to damages in an amount to be proven at trial or as this Court may award as just and appropriate compensation under the law.

## SECOND CAUSE OF ACTION

**(Intentional Interference with Prospective Economic Advantage)**

**By All Counterclaimants Against Sadat**

43. Sadat knew of the business and contractual relationship between Counterclaimants and Barhydt.

44. Sadat intentionally interfered with an economic relationship between

Counterclaimants and Bill Barhydt ("Barhydt"), among others, that probably would have resulted in an economic benefit to Counterclaimants.

45. Chen was introduced to Barhydt by Marissa Kim as someone who might want to invest in SSO. In fact, Barhydt did eventually invest in SSO, which was managed by CTM. SSO, CTM, and Chen, as managing member of CTM, stood to obtain an economic benefit by Barhydt's investment because Counterclaimants would have been entitled to management and trading fees pursuant to the SSO Subscription Agreement and the TSA.

46. Sadat knew of the economic relationship between Counterclaimants and Barhydt.

47. The relationship between Counterclaimants and Barhydt was disrupted by Sadat's actions and threats, and Counterclaimants were harmed as a result.

48. Sadat's meritless demands and interference based upon unenforceable contractual language was a substantial factor in causing Counterclaimants' harm.

49. Counterclaimants are hereby entitled to damages in an amount to be proven at trial or as this Court may award as just and appropriate compensation under the law.

## THIRD CAUSE OF ACTION

### (Tortious Interference with Existing Contract)
### By All Counterclaimants Against Sadat

50. Sadat intentionally interfered with an existing contract between Counterclaimants and Barhydt.

51. SSO, CTM, and Chen, as managing member of CTM, stood to obtain revenue as a result of the contractual relationship between Barhydt and Counterclaimants because Counterclaimants would have been entitled to management and trading fees pursuant to the SSO Subscription Agreement and the TSA.

52. Sadat knew of the contractual between Counterclaimants and Barhydt at the time of her interference.

53. On several occasions, Sadat demanded that Counterclaimants terminate their relationship with Barhydt based upon the unenforceable non-circumvention language of the NCNDA, including Sadat threating to initiate litigation against Counterclaimants if they did not so terminate the relationship. It was Sadat's stated intention to terminate or disrupt the performance of the contract between Barhydt and CTM and SSO.

54. In fact, upon initiating this litigation, Barhydt withdraw his entire investment, thereby frustrating performance under the contract.

55. The relationship between Counterclaimants and Barhydt was disrupted and Counterclaimants were harmed.

56. Sadat's meritless demands and interference was a substantial factor in causing Counterclaimants' harm.

57. Counterclaimants are hereby entitled to damages in an amount to be proven at trial or as this Court may award as just and appropriate compensation under the law.

## FOURTH CAUSE OF ACTION

**(Declaratory Relief)**

**(18 U.S.C. § 2201)**

**All Counterclaimants Against All Counter-Defendants**

58. An actual controversy exists between Counterclaimants and Counter-Defendants concerning their rights and obligations with respect to Section 2 of the NCNDA (Non-Circumvention and Non-Solicitation). Section states, as follows:

> "While this NCNDA remains in effect, and for a period of one (1) year after termination of this NCNDA, neither Party shall solicit or accept funds or information, directly or indirectly, from any from any (past, present, or prospective) client, investor, business partner, researcher, general partner, limited partner, prospective partner, shareholder, service provider or associate of the other party (each,

an "Exclusive Contact"), unless the other party had a relationship with such Exclusive Contact pre-dating the Inception Date. Additionally, the Parties agree that during the Term of this NCNDA, the Parties will not directly or indirectly: (a) encourage any Exclusive Contact to turn down, terminate or reduce a business relationship with the other party; or (b) hire, solicit, recruit, induce, procure or attempt to hire, any person who is a prospective or current member of the other Party."

59. Counter-Defendants claim that Section 2 is binding on Counterclaimants in such a manner that Counterclaimants are barred from doing business with any person (including Barhydt) or entity that Counter-Defendants introduced to Counterclaimants. Counterclaimants contend the provision is void as a matter of law, pursuant to California Business & Professions Code §16600, which states that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind **is to that extent void**." (emphasis added).

60. Because a portion of Counter-Defendants' claims against Counterclaimants relies on this provision of the NCNDA, Counterclaimants desire a judicial determination that Section 2 of the NCNDA is void and unenforceable, as a matter of law.

61. A judicial determination is necessary to avoid confusion on the part of any of the parties to the NCNDA and to avoid the costs of unnecessary litigation in the event of future non-compliance with said Section 2.

## Prayer for Relief

WHEREFORE, Counterclaimants respectfully pray for entry of judgment in their favor and against Counter-Defendants as follows:

(a) Entering a judgment for a preliminary and permanent injunction enjoining Counter-Defendants, their respective members, officers, principals, shareholders, agents, servants, employees, attorneys, successors, and assigns; and those in privity

DEFENDANTS JIMMY CHEN, CHEN TRADING MANAGEMENT, LLC AND SILVERSTREAM
OPPORTUNITY FUND, LLC'S FIRST AMENDED COUNTERCLAIMS

with or in active concert or participation with any of them who receive actual notice of the judgment by personal service or otherwise from any further misappropriation of Counterclaimants' trade secrets, namely the Algorithm;

    (b) Awarding compensatory damages, statutory damages, exemplary damages, and such other relief as provided by law;

    (c) Awarding the costs of bringing suit and other reasonable costs, including reasonable attorneys' fees;

    (d) Awarding the amount of lost profits and other economic damages as a result of Counter-Defendants' intentional interference with Counterclaimants' contract with Barhydt and damages for losses attributed to Counterclaimants' loss of prospective economic damages;

    (e) Awarding pre-judgment and post-judgment interest on any such monetary relief declared; and

    (f) For such other and further relief as this Court deems just and proper.

DATED: July 17, 2020            DONAHOE YOUNG & WILLIAMS LLP

By: /s/ Lucas E. Rowe
Mark T. Young
Taylor F. Williams
Lucas E. Rowe
Attorneys for Defendants CHEN TRADING MANAGEMENT, LLC, SILVERSTREAM OPPORTUNITY FUND, LLC, and JIMMY CHEN

**PROOF OF SERVICE BY ELECTRONIC SERVICE AND MAIL**
**(F.R.Civ.P. Rule 5(b); U.S.D.C., C.D. Cal. Local Rule 5-3)**
**(Cal. Code of Civ. Proc. §§1005, 1010.6, 1013, 1013a; Cal. Rules of Court 2.251)**

I, the undersigned, declare as follows: I am over the age of 18 years. I am not a party to the within action. I am employed in Los Angeles County in the offices of a member of the bar licensed to practice before this court, to whose direction this service is made. My business address is 25152 Springfield Court, Suite 345, Valencia, California 91355.

On July 17, 2020, I served the **"JIMMY CHEN, CHEN TRADING MANAGEMENT, LLC AND SILVERSTREAM OPPORTUNITY FUND, LLC'S FIRST AMENDED COUNTERCLAIMS AGAINST HANIEH SADAT, GENESYSONE CAPITAL, LLC, AND GENESYSONE PARTNERS, LP"** on the interested parties in this action as follows:

[X]   By Electronic Service: I electronically served the document(s) described above on recipients as follows:

yxh@msk.com (Yakub Hazzard); mmcfarlane@leichtmanlaw.com (Matthew McFarlane)

[ ]   By Mail: I placed a true and correct copy of the document in a sealed envelope addressed as follows:

The envelope was mailed with postage thereon fully prepaid. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the United States Postal Service on that same day with postage thereon fully prepare at Valencia, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after the date of deposit for mailing stated in this affidavit.

Executed on July 17, 2020, at Valencia, California.

I declare under penalty of perjury that the foregoing is true and correct.

*/s/ Kristy Ballew*
KRISTY BALLEW

**DONAHOE YOUNG & WILLIAMS LLP**
25152 SPRINGFIELD COURT, SUITE 345
VALENCIA, CALIFORNIA 91355-1081
TELEPHONE (661) 259-9000